**POTTER HANDY LLP**
Russell Handy, Esq., TX SBN 24117976
1410 E Winding Way, Suite B
Friendswood, TX 77546
Phone: (415) 534-1911
Email: ServeHT@potterhandy.com

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| **JANE DOE (TB-00002),**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**G6 HOSPITALITY, LLC;**<br>**G6 HOSPITALITY FRANCHISING, LLC;**<br>**PARAMOUNT HOSPITALITY, LP;**<br>**ESQUIRE HOSPITALITY MANAGEMENT, LLC;**<br>**HARK HOSPITALITY, LLC;**<br>**3J HOSPITALITY, LLC;**<br>**CHOICE HOTELS INTERNATIONAL, INC;**<br>**HOLIDAY HOSPITALITY FRANCHISING, LLC;**<br>**I RAM MONEY TREE INVESTMENTS, LTD.;**<br>**AHIP TX AMARILLO 8231 PROPERTIES LLC;**<br>**AHIP TX AMARILLO 8231 ENTERPRISES LLC;**<br>**ONE TX WEST MEDICAL HI MANAGEMENT LLC;**<br>**ONE LODGING MANAGEMENT, INC., formerly known as TOWER ROCK HOTELS & RESORTS INC.'** | **Case No.:**<br><br>**JUDGE:**<br><br>**Complaint for Damages:**<br><br>**18 U.S.C. § 1595 (TVPRA)**<br><br>**18 U.S.C. § 2255 (CAVRA)**<br><br>**Tex. Civ. Prac. & Rem. Code Ch. 98**<br><br>**Texas Common-Law Claims**<br><br>**Demand for Jury Trial** |

**ONE LODGING HOLDINGS LLC, as alleged assignee and successor in interest; and**

**DOES 1-10,**

**Defendants.**

## PLAINTIFF'S COMPLAINT

## INTRODUCTION

1. Plaintiff Jane Doe (TB-00002) seeks relief for injuries caused by a sex-trafficking venture that exploited her at hotels in Amarillo, Texas, beginning in approximately 2013 when she was fifteen years old and continuing through mid 2017. During that period, Plaintiff was subjected to commercial sexual exploitation, repeated rape, physical violence, strangulation, threats, drug-facilitated control, isolation, and economic coercion.
2. Plaintiff was trafficked at: (a) Motel 6 Amarillo TX West, 2032 Paramount Boulevard; (b) Quality Inn Amarillo East, 1515 East Interstate 40; and (c) Holiday Inn Amarillo West Medical Center, 8231 West Amarillo Boulevard.
3. Plaintiff does not rely merely on the general prevalence of prostitution or trafficking in hotels. She alleges a repeated, property-specific commercial relationship in which her trafficker obtained rooms for days at a time, brought multiple buyers to those rooms, controlled Plaintiff in the presence of hotel personnel, and continued receiving rooms and services after personnel repeatedly observed facts indicating that Plaintiff was underage and was not acting voluntarily. The precise facts for each property are alleged separately below.

## PARTIES

4. Plaintiff is a citizen of Texas. She was born in 1998, was fifteen when the trafficking began, and reached age eighteen in 2016. Plaintiff commenced this action before ten years elapsed after she reached eighteen. To protect her privacy under Federal Rule of Civil Procedure

5.2, Plaintiff does not plead her complete birth date in this public filing and will provide it through a protected submission if required.

5. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[1] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[2] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[3]

6. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16). a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.

7. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

8. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of

---

[1] Fed. R. Civ. P. 10(a).

[2] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[3] Fed. R. Civ. P. 26(c).

judicial openness.

9. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

10. Defendant G6 Hospitality, LLC is a Delaware limited liability company with its principal place of business in Texas. Upon information and belief, during relevant portions of the period alleged, it owned, operated, managed, supported, or exercised direct control over one or more Motel 6 system functions implicated in this action, including reservation, revenue-management, data, payment, training, inspection, safety, reporting, and franchise-compliance functions.

11. Defendant G6 Hospitality Franchising, LLC is a Delaware limited liability company that franchised and licensed the Motel 6 brand. Upon information and belief, it required the use of, administered, or retained contractual control over portions of the Motel 6 operating system implicated in this action. G6 Hospitality, LLC and G6 Hospitality Franchising, LLC are referred to collectively as the "G6 Defendants." Plaintiff pleads their precise allocation of functions in the alternative because the governing agreements and internal records are principally within their possession.

12. Defendant Paramount Hospitality, LP is a Texas limited partnership that, upon information and belief, owned, leased, operated, and/or held the Motel 6 license for Motel 6 Amarillo TX West during some or all of the relevant period.

13. Defendant Esquire Hospitality Management, LLC is a Texas limited liability company that, upon information and belief, managed, operated, staffed, and/or employed personnel at Motel 6 Amarillo TX West during some or all of the relevant period.

14. Defendant Hark Hospitality, LLC is a Texas limited liability company that, upon information and belief, owned, leased, managed, operated, and/or held the Quality Inn license for Quality Inn Amarillo East during some or all of the relevant period.

15. Defendant 3J Hospitality, LLC is a Texas limited liability company that, upon information and belief, owned, leased, managed, operated, and/or employed personnel at Quality Inn Amarillo East during some or all of the relevant period.

16. Defendant Choice Hotels International, Inc. is a Delaware corporation that franchised or licensed the Quality Inn brand and, upon information and belief, required the use of, administered, or retained contractual control over portions of the Quality Inn operating system implicated in this action, including reservation, property-management, data, payment, training, inspection, guest-feedback, safety, reporting, and franchise-compliance functions.

17. Defendant Holiday Hospitality Franchising, LLC is a Delaware limited liability company that franchised or licensed the Holiday Inn brand and, upon information and belief, required the use of, administered, or retained contractual control over portions of the Holiday Inn operating system implicated in this action, including reservation, property-management, front-office, guest-service, training, inspection, safety, reporting, and franchise-compliance functions.

18. Defendant I Ram Money Tree Investments, Ltd. is a Texas limited partnership publicly associated with the Holiday Inn Amarillo West Medical Center beginning in approximately

2011. Upon information and belief, it owned, leased, operated, managed, employed personnel at, and/or held the Holiday Inn license for the property during at least a portion of the period preceding the October 2014 AHIP acquisition.

19. Defendant AHIP TX Amarillo 8231 Properties LLC is, upon information and belief, the entity that acquired or held the hotel real property and improvements at 8231 West Amarillo Boulevard on or about October 28, 2014, and thereafter owned, possessed, controlled, and financially benefited from the Holiday Inn Amarillo West Medical Center during relevant portions of Plaintiff's trafficking.

20. Defendant AHIP TX Amarillo 8231 Enterprises LLC is, upon information and belief, the operating, lessee, employer, revenue-receiving, and/or Holiday Inn licensee entity for the Holiday Inn Amarillo West Medical Center after the October 2014 acquisition. AHIP TX Amarillo 8231 Properties LLC and AHIP TX Amarillo 8231 Enterprises LLC are referred to collectively as the "AHIP."

21. Defendant ONE TX West Medical HI Management LLC ("ONE West Medical") is, upon information and belief, a limited liability company that directly managed the Holiday Inn Amarillo West Medical Center during some or all of the period following AHIP's acquisition of the property in approximately October 2014. Contemporaneous financing records identify ONE West Medical as one of the property-management entities for AHIP's three-hotel Amarillo portfolio. Its designation as the "West Medical HI" manager corresponds to the Holiday Inn West Medical Center located at 8231 West Amarillo Boulevard. Upon information and belief, ONE West Medical employed, supervised, or controlled hotel management and personnel and exercised authority over front-desk operations, guest registration, reservations, room assignment, payment processing,

housekeeping, guest access, security, incident response, and other injury-producing functions alleged herein.

22. Defendant ONE Lodging Management, Inc., formerly known as Tower Rock Hotels & Resorts Inc. ("ONE/Tower Rock"), was AHIP's exclusive master hotel manager during relevant portions of Plaintiff's trafficking. ONE/Tower Rock entered into a Master Hotel Management Agreement with AHIP dated February 20, 2013. Upon information and belief, when AHIP acquired the subject Holiday Inn on or about October 28, 2014, the property became subject to that Master Hotel Management Agreement, a joinder thereto, and/or a related property-level hotel-management agreement. Upon information and belief, ONE/Tower Rock exercised supervisory and operational authority over the management systems, policies, personnel, training, reporting, guest-safety, front-office, housekeeping, security, and incident-response functions at the Holiday Inn Amarillo West Medical Center.

23. Defendant ONE Lodging Holdings LLC ("ONE Holdings") is, upon information and belief, a subsidiary of Aimbridge Hospitality LLC. In approximately April 2018, after the conduct giving rise to Plaintiff's claims, the Master Hotel Management Agreement and related individual hotel-management agreements previously held or performed by ONE/Tower Rock were transferred or assigned to ONE Holdings and/or other Aimbridge-affiliated entities.

24. Plaintiff alleges in the alternative and upon information and belief that ONE Holdings acquired or assumed the contractual rights, obligations, operations, records, personnel, and management functions previously held or performed by ONE/Tower Rock. The precise terms of the transfer, including the extent to which ONE Holdings expressly assumed

liabilities arising from ONE/Tower Rock's pre-transfer management of the subject Holiday Inn, are contained in transaction, assignment, assumption, and management documents exclusively or primarily within Defendants' possession.

25. Plaintiff does not allege that ONE Holdings directly owned, operated, managed, possessed, controlled, franchised, or received hotel revenue from the Holiday Inn Amarillo West Medical Center during Plaintiff's trafficking. Plaintiff seeks relief against ONE Holdings only to the extent discovery establishes that it expressly assumed the liabilities at issue, is a legal successor responsible under applicable law for liabilities of ONE/Tower Rock, or is otherwise derivatively liable for ONE/Tower Rock's pre-transfer conduct. ONE Holdings may also possess relevant records, personnel, and electronically stored information concerning the pre-transfer hotel-management operations, but possession of such information is not alleged as an independent basis of liability.

26. Defendants I Ram Money Tree Investments, Ltd.; AHIP TX Amarillo 8231 Properties LLC; AHIP TX Amarillo 8231 Enterprises LLC; ONE TX West Medical HI Management LLC; and ONE Lodging Management, Inc., formerly known as Tower Rock Hotels & Resorts Inc., are referred to collectively as the "Holiday Inn Local Defendants."

27. Defendants Paramount Hospitality, LP; Esquire Hospitality Management, LLC; Hark Hospitality, LLC; 3J Hospitality, LLC; and the Holiday Inn Local Defendants are referred to collectively as the "Local Hotel Defendants." G6 Hospitality, LLC; G6 Hospitality Franchising, LLC; Choice Hotels International, Inc.; and Holiday Hospitality Franchising, LLC are referred to collectively as the "Franchisor Defendants."

28. All Defendants other than ONE Lodging Holdings LLC are referred to, when appropriate, as the "Direct-Liability Defendants." ONE Lodging Holdings LLC is not included within

the terms "Local Hotel Defendants," "Holiday Inn Local Defendants," "property owner/operator defendants," "managers," "licensees," or "employers" unless expressly stated. It is sued solely in its alleged assignee and successor capacity.

29. Plaintiff pleads the ownership, operating, licensing, management, employer, and agency roles of the Holiday Inn owner/operator defendants in the alternative under Federal Rule of Civil Procedure 8(d)(2) and (3). The agreements allocating those responsibilities—including purchase documents, leases, Holiday Inn license agreements, hotel-management agreements, and employment arrangements—are exclusively or primarily within Defendants' possession.

30. DOES 1–10 are persons or entities whose identities are presently unknown and who directly participated in, owned, operated, managed, employed personnel at, licensed, or exercised control over the injury-producing functions at one or more subject properties. Plaintiff will proceed diligently to identify and substitute them.

## JURISDICTION AND VENUE

31. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, and the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255. This Court has supplemental jurisdiction over Plaintiff's related Texas-law claims under 28 U.S.C. § 1367 because those claims arise from the same trafficking, hotel stays, commercial relationships, operational practices, and injuries as Plaintiff's federal claims and form part of the same case or controversy.

32. Venue is proper in the Eastern District of Texas under 28 U.S.C. §§ 1391(b)(1), 1391(b)(2),

1391(c)(2), and 1391(d). Venue for Plaintiff's claim under 18 U.S.C. § 2255 is governed by the applicable requirements of 28 U.S.C. § 1391. See 18 U.S.C. § 2255(c)(1).

33. Each Direct-Liability Defendant is subject to personal jurisdiction in Texas with respect to this action because it purposefully owned, operated, managed, controlled, franchised, licensed, supervised, or derived revenue or other value from hotels located in Texas, including one or more of the Texas hotels at which Plaintiff was trafficked. The Direct-Liability Defendants entered into continuing commercial relationships concerning Texas hotels, directed or controlled aspects of Texas hotel operations, and received franchise fees, management fees, royalties, rents, room revenues, or other financial benefits generated by Texas hotel operations. Accordingly, each Direct-Liability Defendant is a resident of Texas for venue purposes under 28 U.S.C. § 1391(c)(2).

34. Plaintiff asserts personal jurisdiction over ONE Holdings solely with respect to the alleged assignment, assumption, and successor relationship. Upon information and belief, ONE Holdings purposefully succeeded to or accepted hotel-management agreements, contractual relationships, records, personnel, operations, rights, and obligations concerning Texas hotels in the AHIP portfolio and continued to receive benefits from those Texas management relationships. Plaintiff alleges that ONE Holdings is subject to personal jurisdiction in Texas on claims arising from that alleged succession and assumption. Plaintiff does not rely on any allegation that ONE Holdings directly participated in the underlying trafficking conduct before April 2018.

35. One or more Defendants also reside in the Eastern District of Texas for purposes of 28 U.S.C. § 1391(b)(1). At all relevant times, the G6 Defendants, Choice, and Holiday purposefully conducted continuing hotel-franchising and hotel-operating activities within

this District through branded hotels, franchise relationships, centralized reservation and payment systems, property-management and guest-data systems, advertising and loyalty programs, brand-standard enforcement, property inspections, employee and franchisee training, guest-safety policies, anti-trafficking programs, incident-reporting procedures, and the collection of fees derived from room revenues generated within this District.

36. Those Eastern District contacts are related to the claims asserted in this action. Plaintiff does not rely merely on Defendants' unrelated sale of hotel rooms or general business presence within this District. Plaintiff challenges the same corporate systems, policies, practices, reporting channels, training programs, franchise controls, and revenue-generating arrangements that Defendants required, administered, and financially benefited from at their branded properties throughout Texas, including within this District and at the subject hotels. Plaintiff alleges that Defendants' design, implementation, administration, monitoring, and enforcement—or lack of enforcement—of those systems and policies enabled trafficking to continue at their Texas properties and permitted Defendants to continue deriving revenue from room rentals associated with trafficking activity.

37. If the Eastern District of Texas were treated as a separate State, Defendants' purposeful and claim-related activities within this District would be sufficient to subject one or more Defendants to personal jurisdiction here. Those Defendants therefore reside in this District under 28 U.S.C. §§ 1391(c)(2) and 1391(d). Because all Defendants are residents of Texas for purposes of this action and one or more Defendants reside in this District, venue is proper under 28 U.S.C. § 1391(b)(1).

38. Venue is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District.

Defendants conducted substantial portions of their Texas hotel-franchising and operating ventures within this District and implemented here the same reservation, payment, guest-data, inspection, training, safety, anti-trafficking, incident-reporting, and franchise-compliance systems at issue in this action. Defendants also allegedly failed within this District to correct known deficiencies in those uniform systems and practices despite receiving information concerning prostitution, commercial sexual exploitation, trafficking indicators, criminal activity, and failures by hotel personnel to identify, escalate, and report suspected trafficking.

39. Plaintiff's claims arise not only from the physical assaults committed in individual hotel rooms, but also from Defendants' continuing participation in, control over, and receipt of financial benefits from hotel-operating ventures employing common systems and practices across their Texas properties. Defendants' implementation and continued use of those challenged systems and practices within the Eastern District constitute a substantial and material part of the conduct and omissions giving rise to Plaintiff's claims.

40. The fact that additional events occurred at hotels located in another federal judicial district does not preclude venue here. Section 1391(b)(2) permits venue in more than one district and does not require Plaintiff to select the district in which the greatest number of events occurred. It requires only that the Eastern District have a substantial connection to the events or omissions giving rise to the claims, as alleged above.

41. Defendants have purposefully availed themselves of the privilege of conducting hotel-franchising, hotel-operating, marketing, reservation, payment-processing, guest-data, and revenue-generating activities within the Eastern District of Texas. Exercising jurisdiction and venue over them in this District is consistent with traditional notions of fair play and

substantial justice.

42. Each defendant is subject to personal jurisdiction in Texas because it owned, operated, managed, franchised, transacted business concerning, or purposefully directed relevant conduct toward one or more Texas hotels and the claims arise from those contacts.

## ACCRUAL AND TIMELINESS

### A. TVPRA

43. Section 1595(c) requires filing within the later of ten years after the cause of action arose or ten years after the victim reached eighteen. Plaintiff was born in 1998, reached eighteen in 2016, and commenced this action in the first week of August 2026, before ten years elapsed after she reached eighteen. Her § 1595 claims arising from offenses committed while she was a minor are therefore timely under § 1595(c)(2).

44. Plaintiff does not rely on equitable tolling to establish the timeliness of the § 1595 claim. The claim is timely on the face of § 1595(c) based on Plaintiff's age when the trafficking began, the continuation of the trafficking into 2017, and the early August 2026 commencement of this action.

### B. CAVRA

45. Plaintiff was a minor victim of violations of 18 U.S.C. § 1591 and suffered personal injury as a result. Under the version of § 2255 in effect immediately before September 16, 2022, Plaintiff's claim remained timely until at least ten years after she reached eighteen in 2016. The claim was therefore unbarred on September 16, 2022; the 2022 amendment applies; and § 2255(b) now provides no time limit for this claim.

### C. Texas Claims Arising from Child Trafficking

46. The Texas negligence-based counts are pleaded for Defendants' conduct and omissions that caused or enabled Plaintiff's trafficking and injuries while she was under eighteen. The underlying conduct violated the Texas child-trafficking and compelling-prostitution provisions enumerated in Texas Civil Practice and Remedies Code § 16.0045(a), et seq.

47. Section 16.0045(a) provides thirty years for personal-injury claims arising from the enumerated child-trafficking and child-sexual-abuse conduct. Section 16.001 excludes the period of minority from the limitations calculation. Plaintiff remained a minor until mid-August of 2016.

48. The previously applicable fifteen-year period had not expired on September 1, 2019. After excluding Plaintiff's minority under § 16.001, that prior period would not have expired until 2031. H.B. 3809 therefore applies its thirty-year period to these previously unexpired claims, extending the limitations period for qualifying child-period claims into 2046.

49. Texas courts apply § 16.0045 to negligence claims against nonperpetrators whose negligence allegedly proximately caused or enabled the enumerated sexual abuse. The claims in Counts III–VI, insofar as they arise from trafficking and exploitation occurring while Plaintiff was a minor, were filed well within the resulting limitations period.

50. The Texas negligence-based counts are limited to Defendants' conduct and omissions that caused or enabled Plaintiff's trafficking and injuries before she reached eighteen in 2016. Plaintiff seeks all continuing physical, psychological, reproductive, and economic damages proximately caused by that child-period conduct. Plaintiff does not presently plead post-majority conduct as a separate state-law accrual event absent an independently sufficient limitations or tolling basis.

51. The Chapter 98 claim is likewise timely. It is predicated on Plaintiff's child trafficking and

compelling prostitution and on Defendants' intentional or knowing benefits and affirmative participation during the period in which she was a minor. The prior limitations period remained unexpired on September 1, 2019, and the applicable child-trafficking limitations period, excluding minority, extends well beyond the filing date.

## SEX TRAFFICKING OVERVIEW

52. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

53. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

54. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

55. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence,

though disturbingly, it can start as early as infancy.

56. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

57. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

58. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

59. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

60. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

61. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

62. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

63. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

64. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging

establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

65. For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

66. In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

67. The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a mutually beneficial relationship between Defendants and traffickers, sustained by the

sexual exploitation of victims.

68. In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, ECPAT, among others, have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay—from check-in to check-out—traffickers and victims display recognizable warning signs.

69. Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

70. Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

71. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees

who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

72. The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

73. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

74. In approximately 2013, when Plaintiff was fifteen and attending high school, she met an adult male known as "T." T pursued a romantic relationship despite the substantial age difference and progressively isolated Plaintiff from her family and support system.

75. After Plaintiff left home, T confiscated her phone, restricted her communications and movement, controlled her daily activities, and compelled her to engage in commercial sex acts for his financial benefit.

76. T advertised Plaintiff online, arranged encounters with buyers, controlled the time and location of the encounters, and retained the money and other value paid by buyers.

77. T maintained control through repeated physical violence, threats, intimidation, drugs,

strangulation, and coercion. On one occasion, he beat Plaintiff with a belt so severely that she required approximately one month of hospitalization. He forced her to continue commercial sex during pregnancies.

78. Plaintiff remained under T's control through 2018. She gave birth to two children fathered by T during the trafficking period.

**A. Motel 6 Amarillo TX West**

79. T repeatedly used Motel 6 Amarillo TX West in the between 2013 and 2016, when Plaintiff was under eighteen.

80. T would rent rooms at this property for multiple days at a time before moving Plaintiff to other locations and then later returning to Motel 6 Amarillo TX West. He trafficked Plaintiff at this property regularly, each time for several days a week. This Motel 6 was T's primary and preferred hotel for sex trafficking.

81. The exterior-facing layout permitted buyers to reach rooms directly. Plaintiff observed open drug activity, young females engaged in commercial sex, repeated disturbances, and on at least one occasion, a physical altercation necessitated the involvement of law enforcement.

82. T interacted frequently with hotel employees during their repeated stays. She and her trafficker were easily recognized and acknowledge by employees. Over the course of her trafficking at this Motel 6, through regular, frequent, and repetitive interactions, Plaintiff and her trafficker became familiar with employees beyond the typical guest/hotel relationship. Housekeeping staff did not enter the room while Plaintiff occupied it as it was T's established and known preference that cleaners were not permitted to clean the room during their stays.

83. During her stays at the property, Plaintiff appeared noticeably younger than eighteen, frequently wore revealing clothing associated with commercial sex activity, and often appeared under the influence of drugs supplied by T. Plaintiff also did not have any travel luggage.

84. Despite the repeated pattern and observed indicators of minority and coercive control, the Motel 6 operator defendants continued renting rooms and providing services to T.

**B. Quality Inn Amarillo East**

85. T also used the Quality Inn Amarillo East, located at 1515 E. Interstate 40, Amarillo, Texas 79102 ("Quality Inn Amarillo") for the sex trafficking of the Plaintiff. Plaintiff was under eighteen during her trafficking at this property.

86. He trafficked Plaintiff at this property an estimated combined total of approximately six - ten days involving at least two different stays at the property. This location was used when alternative locations, like the Motel 6, were not available.

87. T required Plaintiff to meet approximately six to seven buyers per day. Because the rooms were reached through interior corridors, Plaintiff and T repeatedly entered through the lobby and passed front-desk personnel as did the men who were paying for commercial sex with Plaintiff.

88. Employees repeatedly observed Plaintiff with T.

89. Despite her under-eighteen appearance and the circumstances under which she was present at the hotel, nobody asked about her welfare, age, or relationship with T.

90. On at least one occasion Plaintiff, scantily clad and visibly underage, needed assistance from a hotel employee locating the vending machines.

91. Plaintiff also requested additional towels.

92. Despite the repeated pattern and observed indicators, the Holiday Inn owner/operator defendants continued renting rooms and providing services to T.

**C. Holiday Inn Amarillo West Medical Center**

93. T also utilized a third hotel, the Holiday Inn Amarillo West Medical Center, located at 8231 W. Amarillo Boulevard, Amarillo, Texas ("Holiday Inn Amarillo"). Plaintiff would accompany T at the front desk while he completed the registration process.

94. Plaintiff remained largely silent during these interactions and was never asked to provide identification or otherwise verify her identity or age. Plaintiff recalls that hotel employees had repeated opportunities to observe her in the company of T during check-in and throughout her stay.

95. While staying at the Holiday Inn Amarillo, Plaintiff performed sex acts on commercial sex buyers whom she perceived to be more affluent based on their clothing, jewelry, and overall appearance. Plaintiff observed these buyers pay T with cash immediately following commercial sex encounters.

96. Despite the high traffic through the hotel, Plaintiff's visible "underage" status, and the highly irregular clothing she wore, neither Holiday Inn management nor employees ever inquired about Plaintiff or behaved in a manner suggesting they would intervene on her behalf.

97. Plaintiff was under eighteen during at least the Holiday Inn stays supporting her child-period claims under 18 U.S.C. § 2255, Texas Civil Practice and Remedies Code Chapter 98, and the Texas common law. T used the property on repeated occasions during the period in which Plaintiff was a minor. The precise dates of the individual reservations, room assignments, payments, extensions, and stays are reflected in records maintained by

the Holiday Inn Local Defendants and Holiday.

98. To the extent a Holiday Inn stay occurred before the October 28, 2014 acquisition, Plaintiff alleges that I Ram owned, leased, operated, managed, staffed, employed personnel at, received revenue from, and/or held the Holiday Inn license for the property. To the extent a stay occurred on or after that acquisition, Plaintiff alleges in the alternative that AHIP TX Amarillo 8231 Properties LLC owned or possessed the property; AHIP TX Amarillo 8231 Enterprises LLC operated the hotel, employed personnel, received room revenue, or held the Holiday Inn license; ONE West Medical directly managed the property and hotel personnel; and ONE/Tower Rock exercised master-management, supervisory, and operational authority. The precise allocation of those functions is contained in Defendants' agreements and records.

99. Upon information and belief, before the October 2014 acquisition the hotel managers and personnel who registered T, observed Plaintiff, processed room transactions, controlled guest access, and provided guest services acted as employees or agents of I Ram. After the acquisition, those managers and personnel acted as employees or agents of AHIP TX Amarillo 8231 Enterprises LLC and/or ONE West Medical, under the supervisory and management authority of ONE/Tower Rock, while AHIP TX Amarillo 8231 Properties LLC owned or possessed the hotel property. Plaintiff pleads those employment and agency relationships in the alternative.

100. As a direct and proximate result of the trafficking and exploitation she endured, Plaintiff has suffered significant psychological, emotional, and economic injuries, including diagnoses of Post-Traumatic Stress Disorder ("PTSD") and depression.

101. Plaintiff also developed substance abuse issues during the trafficking period and

continues to have trouble maintaining stable employment and healthy interpersonal relationships. She remains in need of ongoing treatment for the injuries caused by her trafficking and exploitation.

**Sex Trafficking at G6 Hotels**

102. G6's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Plaintiff's trafficking that sex trafficking was ongoing and widespread at G6 properties.

103. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[4]

104. Public statements of G6 confirm that they knew that sex trafficking is a problem and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[5] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels."[6]

105. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online reviews for indicia of criminal

[4] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility

[5] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

[6] *Id.*

activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 hotels:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[7]
- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[8]
- In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA.[9]
- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[10]
- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[11]
- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[12]

---

[7] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[8] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[9] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html

[10] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims

[11] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[12] *Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[13]
- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[14]
- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[15]
- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[16]
- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[17]
- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[18]
- On February 1, 2026, Vallejo police arrested 44-year-old Julius Stinson III at the Motel

---

[13] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity

[14] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[15] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

[16]Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[17] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

[18] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

6 on Enterprise Street in Vallejo following a human trafficking investigation. The investigation began the day prior when officers found an injured woman at a separate motel on Fairgrounds Drive. The victim reported being transported across multiple cities and states, subjected to threats, and forced into sexual exploitation through violence and intimidation. Stinson, a felon with prior convictions for attempted murder and voluntary manslaughter, was apprehended at the Enterprise Street Motel 6 and booked into jail without bail on multiple charges, including human trafficking by force or fear, pimping, sexual assault, and false imprisonment.[19]

106. These articles represent only a limited and non-exhaustive sample. Numerous additional reports document sex trafficking and related criminal activity at G6-branded hotels. Moreover, upon information and belief, the G6 Defendants are aware of substantial additional law enforcement activity involving trafficking at their properties that was not reported in the media. In total, state and federal law enforcement agencies have prosecuted several hundred traffickers, involving hundreds of victims, for sex trafficking and forced prostitution conducted at G6-branded properties.

107. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Plaintiff was trafficked at the subject Motel 6, G6 knew or should have known:

108. The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

109. Commercial sex work occurring at G6 branded properties involved trafficking and

[19] Man arrested after alleged trafficking victim found by Vallejo police", Bay City News, NBC Bay Area, (February 1, 2026), https://www.nbcbayarea.com/news/local/man-arrested-trafficking-victim-police-vallejo/4024763/

compelled prostitution;

110. G6 franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 hotel properties;

111. Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

112. They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

113. Several publicly available reviews concerning Motel 6 properties described prostitution, pimps, drug dealers, drug activity, violence, and other criminal conduct occurring openly on the property.

- In 2015, a customer posted an online review for Motel 6 Amarillo TX-West on Tripadvisor stating: "Drug infested Do not stay here unless you love drugs, drug users, angry drug dealers, police and listening to hookers work while you try and sleep. UGH!!!! Came in at 2:00 AM after driving all day and was unable to sleep due to all the activity outside our door and in the rooms around us"
- In 2018, a customer posted an online review for Motel 6 Amarillo TX-West on Google stating: "This is by far the worst place I have ever stayed. Drug dealers dealing drugs out of the rooms all night long. Hookers getting picked up all hours of the night. Scummy broken rooms. The mini fridge I paid extra for didn't work. Mold on the tv remote. I should've known when I went to check in someone else was complaining about all the noise and traffic. These are not soundproof rooms. You can hear everything inside your room that is going on inside the room upstairs including

their footsteps. Not to mention everything outside. Someone also tried to break into my car. Save your money your better off sleeping in your car."

- In 2017, a customer posted an online review for Motel 6 Amarillo TX-West on Kayak stating: "Very obvious drug dealing & prostitution at this location. I'll never stay here again."
- In 2019, a customer posted an online review for Motel 6 Amarillo TX- West on Kayak stating: "Pros (+) Our room was smaller but overall, fairly clean and had the basics. Laundry facilities worked great.

  Cons (-) Crime is high in this area. Police came to the motel during our stay due to drug trafficking. Not a great place to take kids. Definitely keep to yourself and mind your business if you don't want to run into any trouble."

114. These reviews demonstrate that prostitution and trafficking-related indicators were not isolated incidents. Rather, prostitution, pimps, commercial sex solicitation, and related criminal activity were repeatedly observed and publicly reported over more than a decade. The volume, frequency, and consistency of these complaints support a reasonable inference that Defendants knew, or should have known, that prostitution and trafficking-related activity were occurring at the property and failed to take adequate measures to prevent, deter, investigate, or report such conduct.

115. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**Property-Specific Notice at Motel 6 Amarillo TX West**

116. In addition to the brand-wide notice alleged above, contemporaneous, property-specific public records and guest complaints identified prostitution, drug activity, police activity, and unusual activity in and around guest rooms at the subject Motel 6 during the broader period in which Plaintiff was being trafficked:

a. On October 23, 2014, law-enforcement officers arrested two persons at the subject Motel 6, located at 2032 Paramount Boulevard. A local Amarillo news report published the following day stated that both persons were booked on prostitution charges.[20]

b. Because the arrests occurred on the premises and involved an on-site law-enforcement response, Plaintiff alleges on information and belief that managers and personnel of the Motel 6 operator defendants knew of the arrests and generated, received, or maintained related police-contact, incident, security, guest-safety, insurance, or management records.

c. In January 2015, a guest posted a review of this precise Motel 6 describing open drug use and drug dealing, police presence, and prostitution-related activity occurring in or around the rooms surrounding the guest's room.

d. On January 14, 2015, a person identified on the review platform as the manager of the subject Motel 6 publicly responded to that complaint. The manager acknowledged receiving the complaint, apologized for the guest's experience, and stated that the property had "taken corrective action" intended to prevent a recurrence.[21] The response is alleged as evidence that the property's management actually received and responded

[20] https://www.newschannel10.com/story/26884270/canyon-pastor-arrested-on-prostitution-charge/

[21] **Motel 6 Amarillo, TX–West**, TripAdvisor, guest review by "rb4db" (Jan. 2015), and management response by "macpatel, Manager" (Jan. 14, 2015).

to the complaint; Plaintiff does not allege that the response constituted an admission of every factual assertion made by the reviewer.

e. Upon information and belief, the complaint, management response, and claimed corrective action were documented in or transmitted through one or more guest-relations, property-management, incident-reporting, quality-assurance, insurance-reporting, franchise-compliance, or management-communication systems maintained by the Motel 6 operator defendants.

117. The October 2014 arrests and January 2015 complaint and management response do not, standing alone, establish that every instance of prostitution at the property involved human trafficking. Plaintiff alleges those events because they placed the Motel 6 operator defendants on actual or constructive notice that prostitution, drug activity, police activity, and unusual room traffic were occurring at the subject property during the same broader period in which T repeatedly rented rooms to harbor and commercially exploit Plaintiff. Against that property-specific background, Plaintiff's visibly youthful appearance, drug-impaired condition, lack of ordinary travel luggage, repeated multi-day stays, T's controlling conduct, restrictions on housekeeping access, and recurring visitor traffic were not isolated or innocuous circumstances.

118. Additional customer reviews attributed to 2017, 2018, and 2019 described obvious drug dealing, prostitution, persons being picked up for commercial sex, police activity, and drug trafficking at the subject Motel 6. Plaintiff alleges those later reviews as corroborating evidence that the property conditions described in the contemporaneous reports were recurring rather than isolated. Plaintiff does not rely on the 2018 or 2019 reviews as notice provided before Plaintiff's trafficking ended. Despite the contemporaneous notice alleged

above and the Plaintiff-specific indicators observed by personnel, the Motel 6 operator defendants continued renting rooms and providing services to T and failed to implement measures reasonably sufficient to detect, investigate, report, or interrupt his trafficking of Plaintiff.

**Sex Trafficking at Choice Hotels**

119. For years, Defendant Choice has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking, which tragically occurs on its hotel properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff at the hotel brands owned by Choice Hotels. For example:

a. On November 10, 2009, a young child was raped and killed at a Comfort Inn, which is a Choice-branded hotel, in Fayetteville, North Carolina.[22] The incident caused such outrage that child advocates petitioned Defendant Choice to take steps to prevent sex trafficking in its hotels.[23] It was only after this horrific incident that Defendant Choice started to publicize a need for change.

b. In December of 2009, authorities found a man was attempting to use a Comfort Suites in Orlando, Florida, to sex traffic a fifteen-year-old girl. He was arrested when the fifteen-year-old girl ran into a store to contact authorities.[24]

---

[22] WRAL.com, *Shaniya Davis Was Raped, Killed On Same Day* (Nov. 20, 2009), http://www.wral.com/news/local/story/6464217/ (Warrants: Girl abducted, raped, killed on same day.)

[23] *See* Change.org Petition, *Tell Choice Hotels To Prevent Child Prostitution In Their Hotels*, available at https://www.change.org/search?q=tell+choice+hotels+to+prevent+child+prostitution+in+their+hotels (last visited Mar. 4, 2019).

[24] *Cops: Man Tried to Sell Girl, 15, for Sex,* The Orlando Sentinel, Dec. 23, 2009.

c. In November 2010, Defendant Choice partnered with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[25] However, Defendant Choice did not enforce the program, or require its employees to complete this training, or even follow up to make sure the hotels were following the protocols.[26]

d. In May of 2012, two men were charged with promoting prostitution and engaging in prostitution inside of a Comfort Suites hotel room in Asbury Park, New Jersey.[27]

e. In 2012, an anti-trafficking coalition alerted Defendant Choice of the likelihood of sex trafficking during the London Olympics, and inquired about the company's anti-trafficking policies, while urging immediate action regarding trafficking.[28]

f. Additionally, Defendant Choice has been aware of sex trafficking and guest safety issues at its branded properties through publicly available websites such as www.tripadvisor.com, www.expedia.com, and www.booking.com. Online reviews show the pervasiveness of customer reported sex trafficking and guest safety issues on Choice-branded properties and Defendant Choice's inattentiveness, for example

g. In April of 2011, a female escort was choked and robbed by three men in a Choice branded Quality Inn hotel room in Plantation, Florida.[29]

h. In February of 2012, a fourteen-year-old girl was found at a Choice branded Quality

---

[25] *See* Choice Hotels*, Human Rights Policy*, available at https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Mar. 4, 2019); *see also* ECPAT-USA, *Tourism Protection Code of Conduct*, available at http://www.ecpatusa.org/code/ (last visited Mar. 4, 2019).
[26] *See* Choice Hotels, *Human Rights Policy, supra,* n.30.
[27] 2 Men Charged with Prostitution, Asbury Park Press, May 19, 2012, at pg B3.
[28] *See* Christian Brothers Investment Services, London Olympics Report Release, *available at* https://cbisonline.com/us/london-olympics-report-release/.
[29] *Escorts Target of Spree*, The Miami Herald, Jun. 06, 2011, at pg 20.

Inn in Oakland, Pennsylvania after missing for a year when authorities set up a sting operation into internet advertisement.[30]

i. In March of 2012, two men were arrested for sex trafficking two minors at a Choice branded Quality Inn hotel in Houston, Texas.[31]

j. In November 2012, two women and one man were arrested at a Choice branded Quality Inn in Boca Raton, Florida after authorities were seeking to crack down on human trafficking.[32]

k. In 2022, a 31-year-old felon from Desert Hot Springs, was charged in April 2022 with 30 felony counts, including the rape of a 14-year-old girl, child trafficking, and providing controlled substances. The report identifies the Embassy Suites in Ontario, Hilton in Palm Springs, and Quality Inn in Banning as locations involved in the investigation.[33]

l. In July 2025, a 33-year-old Texas man was arrested on human trafficking charges at a Quality Inn on Telegraph Road. Police discovered the trafficking operation after responding to a property damage complaint, finding that the suspect had rented multiple rooms and was coercing victims, some as young as 17, into commercial sex.[34]

120. Several publicly available reviews concerning hotels operating under Choice

---

[30] *Missing Teen Found During Prostitution Bust*, Pittsburgh Post-Gazette, Feb. 12,2012, at pg 12.

[31] *Two Men Accused of Child Sex Violations Await Trials*, The Odessa American, Apr. 14, 2012, at pg A1 and A4.

[32] *Police Arrest 16 in Prostitution Sting*, The Palm Beach Post, Nov. 23, 2012, at pg B010.

[33] "*Felon Charged With Sexually Assaulting Girl, Using Her for Porn",* NBC4 LOS ANGELES, (April 12, 2022), https://www.nbclosangeles.com/news/local/desert-hot-springs-child-sex-trafficking-cabazon/2868525/

[34] Jack Springgate, "*Texas man arrested, charged in human trafficking case in Metro Detroit*", CBS NEWS, (July 24, 2025), https://www.cbsnews.com/detroit/news/man-charged-human-trafficking-southfiled/

Hotels brands described prostitution, pimping, drug activity, violence, and other criminal conduct occurring openly on hotel premises.

121. In 2015, a customer posted an online review for the Quality Inn Amarillo East, on Yelp stating: "This was the worst hotel I've seen. Broken furniture, stains, doors don't close properly, broken lamp, no phone. Poor TV reception, cold hot tub and dirty pool. I booked through choice hotels and saw rave reviews. What a bunch of bs. Worried a hooker might come to the room in the night. A very seedy hotel. Too tired to move on. Tried to call 2 hours before arrival, several times, no answer. Went to talk to the clerk and wasn't anywhere to be found. For Gods sake don't come to this hotel! YUCK. The star is just so I can post."

122. In 2018, a customer posted an online review for the Quality Inn Amarillo East, on Google stating: "Ew. Ew. And did I mention ew? Rooms are disgusting and I'm pretty sure there was a prostitute working in the room next to me. Not worth the price at all."

123. In 2025, a customer posted an online review for the Quality Inn Amarillo East, on choicehotels stating: "Rooms were not clean and in disrepair. Came back from supper and they were removing furniture from one of our rooms. It looked like a pimp was running a prostitution operation out of a room next to us. I can say with great certainty we did not feel safe and we found a different hotel."

124. In 2025, a customer posted an online review for the Quality Inn Amarillo East, on choicehotels stating: "It's scary with all the prostitution traffic going in and out the towels and linen were gross, the tub and toilet were filthy."

125. Publicly available reports and customer reviews concerning hotels operating under Choice Hotels brands reflected recurring complaints involving prostitution, commercial

sex activity, drug activity, violence, and other criminal conduct. The frequency and consistency of those reports support the inference that such activity was not isolated and that Choice Hotels had reason to be aware of recurring criminal activity occurring at hotels operating under its brand standards.

126. Despite publicly available reports describing prostitution, commercial sex activity, and other criminal conduct at Choice Hotels-branded properties, Choice Hotels continued to franchise, market, and benefit financially from those properties while maintaining the authority to establish brand standards, conduct inspections, and require compliance with operational policies.

**Property-Specific Notice at Quality Inn Amarillo East**

127. In addition to Choice's brand-wide knowledge of trafficking and commercial-sex activity at hotels operating under its brands, a contemporaneous customer complaint raised property-specific concerns regarding prostitution-related danger and inadequate front-desk monitoring at Quality Inn Amarillo East.

128. As alleged above, in approximately 2015, a customer reviewing the subject Quality Inn described the property as seedy, expressed concern that prostitution-related activity might reach the customer's room, reported that repeated telephone calls to the property went unanswered, and stated that the front desk was unattended when the customer attempted to speak with hotel personnel.

129. The 2015 review did not expressly identify human trafficking, a minor victim, or T, and Plaintiff does not allege that the review alone proved that trafficking was occurring. The review is alleged because it placed the Quality Inn operator defendants on notice of a

patron's contemporaneous concern regarding prostitution-related danger and the absence of effective front-desk monitoring at a property where guests and unregistered visitors ordinarily passed through the lobby and interior corridors.

130. Upon information and belief, Hark Hospitality, LLC and 3J Hospitality, LLC received, reviewed, monitored, or had access to the 2015 review or substantially similar customer complaints concerning prostitution-related, suspicious, or unsafe activity at the subject property. Upon information and belief, the review or substantially similar complaints were entered into, transmitted through, monitored by, or available within guest-relations, property-management, quality-assurance, review-response, franchise-compliance, or incident-reporting systems maintained by the local operator defendants and Choice.

131. Customer reviews published in 2018 and 2025 described prostitution, suspected pimping, and repeated prostitution-related traffic at the subject Quality Inn. Plaintiff alleges those later reviews only as subsequent corroboration that prostitution-related complaints at the property were recurring rather than wholly isolated. Plaintiff does not rely on the 2018 or 2025 reviews as notice supplied to Defendants before Plaintiff's trafficking ended.

132. The contemporaneous 2015 complaint is material when considered together with the Plaintiff-specific circumstances repeatedly observed at this interior-corridor property: Plaintiff appeared younger than eighteen; she repeatedly entered and exited through the lobby with an older and controlling adult male; approximately six to seven commercial-sex buyers visited her each day; those buyers were required to pass through or near common areas monitored by hotel personnel; and employees repeatedly observed Plaintiff and T together without inquiring into her age, welfare, or relationship with him. The

combination of those circumstances supports the inference that the Quality Inn operator defendants knew or should have known that Plaintiff was being commercially exploited.

133. Despite the property-specific complaint, the Plaintiff-specific indicators, and the repeated buyer traffic alleged above, the Quality Inn operator defendants continued renting rooms and providing services to T and failed to implement measures reasonably sufficient to identify, investigate, report, or interrupt his trafficking of Plaintiff. Choice continued to franchise, market, provide reservation and property-management systems to, and financially benefit from the subject property while retaining the authority and undertaking the functions alleged below.

**Sex Trafficking at Holiday Inn Hotels**

134. Scores of news stories from across the US highlight Holiday Inn's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of Holiday Inn hotels for sex trafficking.

135. Information that has become public through news stories establishes the entrenched and pervasive nature of Holiday Inn's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Holiday Inn hotels for illegal activity, the following was noted:

a. In 2014, police arrested several individuals for running a sex trafficking ring out of a Holiday Inn Express in Allentown, Pennsylvania.[35]

b. In April 2017, a 16-year-old trafficking victim was rescued by police at a Holiday Inn Express hotel in Elk Grove, California after her Uber driver noticed signs of trafficking

---

[35] *(Prostitutes From Maryland Worked Out of Downtown Allentown Hotel, Police Say, Lehigh Valle Live),* https://www.lehighvalleylive.com/allentown/2014/04/trio_ran_prostitution_business.html.

as he dropped her off at the hotel and called the police. [36]

c. A 2017 analysis by the Houston Chronicle showed that Holiday Inn branded hotels were one of the most common locations for prostitution and sex trafficking arrests made by the Houston Police Department.[37]

d. In September 2018, a man was criminally charged after a three-month investigation for sex trafficking and was arrested at a Holiday Inn Express in Plainview, New York.[38]

e. In July 2019, a man was arrested at a Holiday Inn Express on Beach Boulevard in Jacksonville Beach, Florida. The arrest was part of a joint FBI and Jacksonville Beach Police Department sting operation targeting human trafficking and sex trafficking.[39]

f. In 2025, a man was arrested at the Holiday Inn in Beaumont, Texas, on charges of aggravated promotion of prostitution and trafficking of persons. The suspect is accused of forcing four victims into prostitution under threats of violence while operating under the direction of an accomplice.[40]

136. These articles demonstrate that prostitution, commercial sex activity, and trafficking-related indicators were not isolated occurrences at hotels operating under the Holiday Inn brand. Rather, reports describing prostitution, commercial sex solicitation, and

---

[36] *(Uber Driver Saves Girl from Sex Slavery, Daily Beast),* https://www.thedailybeast.com/uber-driver-saves-girl-from-sex-slavery.

[37] *(Houston's Most Popular Hotels for Prostitution Busts, Houston Chronicle),* https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php.

[38] *(Police: Gang Member Forced Women into Prostitution, News12 New York*) https://bronx.news12.com/police-gang-member-forced-women-into-prostitution-39006797.

[39] Erik Avanier, *"Suspected pimp 1 of 3 arrested in prostitution sting"*, NEWS4JAX, (July 29, 2019), https://www.news4jax.com/news/2019/07/30/suspected-pimp-1-of-3-arrested-in-prostitution-sting/

[40] Scott Lawrence*, "Man charged with human trafficking, accused of managing prostitution ring"*, KFDM, (October 31, 2025), https://kfdm.com/news/local/man-charged-with-human-trafficking-accused-of-managing-prostitution-ring

other criminal activity appeared repeatedly over an extended period, reflecting a pattern of publicly documented conduct.

137. The volume, frequency, and consistency of these reports support a reasonable inference that Holiday knew, or in the exercise of reasonable care should have known, that trafficking-related activity was occurring at Holiday Inn-branded properties and failed to implement reasonable measures to prevent, deter, investigate, or report such conduct.

## G6 OPERATING, FRANCHISING, AND CONTROL RELATIONSHIP

138. The G6 Defendants operated a national hotel system consisting of company-owned and franchised Motel 6 and Studio 6 properties. Paramount Hospitality, LP and Esquire Hospitality Management, LLC (collectively, the "Motel 6 Operator Defendants") operated the subject Motel 6 as part of that integrated system pursuant to franchise, license, management, and related agreements.

139. The precise franchise agreements, Standards manuals, amendments, operations manuals, property-management requirements, training materials, inspection protocols, guest-safety procedures, reservation-system requirements, reporting protocols, and other System documents applicable to Motel 6 Amarillo TX West from 2013 through 2017 are in Defendants' possession and are not publicly available to Plaintiff. The allegations concerning those documents and the division of responsibilities among the G6 Defendants are therefore pleaded on information and belief.

140. Upon information and belief, the G6 Defendants required the Motel 6 Operator Defendants to operate the subject property as part of G6's mandatory and integrated Motel 6 System and to comply with G6 standards, specifications, policies, operating methods,

training requirements, inspection programs, technology requirements, reservation and payment procedures, and guest-service requirements.

141. G6's System was not limited to trademarks, signage, décor, or physical appearance. Upon information and belief, it included mandatory or centrally administered systems and standards concerning reservations; room inventory; rates and discounts; property-management and guest records; registration, payment, and identity-verification procedures; room assignment and key issuance; stay extensions and cancellations; guest-service and housekeeping procedures; management and staff training; guest complaints; safety and security; do-not-rent decisions; quality-assurance inspections; reporting and escalation; and corrective action for noncompliance.

142. Publicly available G6 materials confirm the existence and scope of centralized systems during relevant portions of the trafficking period. In 2015 G6 selected a cloud-based revenue-optimization platform for Motel 6 and Studio 6 properties. In September 2016 G6 announced that G6ROW was being rolled out to corporate-owned and franchised properties and provided near-real-time rate and inventory management, business intelligence, notifications, and rules-based decision tools. In 2017 G6 announced networkwide deployment of HotelKey's cloud property-management system and an integrated enterprise payment platform across company-owned and franchised locations.

143. Upon information and belief, before and during the rollout of those identified platforms, the subject Motel 6 was already required to participate in G6's then-existing central-reservation, website, telephone, distribution, revenue-management, marketing, and guest-service systems. G6 could make or transmit reservations and collect or receive data concerning guest names, room assignments, reservation history, payment methods,

occupancy, rates, stay extensions, and repeat stays.

144. Upon information and belief, G6 required the subject Motel 6 to use property-management, data-management, reservation, billing, payment, and customer-support systems approved, supplied, hosted, maintained, supported, or controlled by G6; to transmit reservation, payment, occupancy, housekeeping, guest, and performance data through those systems; and to use G6-approved technology and service providers.

145. Upon information and belief, G6 set or approved detailed policies concerning accepted payment methods; cash and prepaid-card transactions; identification requirements; the number and identity of occupants; room access; registration; check-in and checkout; stay extensions; refunds and cancellations; mandatory discounts and fees; rate and inventory rules; rewards programs; and circumstances in which a guest or reservation could be refused, cancelled, or placed on a do-not-rent list.

146. Upon information and belief, G6 established and maintained a brandwide do-not-rent system, controlled policies governing when a person could be placed on or removed from the system, and received or had access to property submissions, guest histories, incident information, and other information relevant to those decisions.

147. Upon information and belief, G6 prescribed, supplied, or approved front-office, guest-service, housekeeping, security, and incident-response policies. Those policies included the frequency and circumstances of room entry; procedures for repeated refusals of housekeeping; procedures for guest-welfare concerns; unusual visitor traffic; suspicious cash or prepaid-card activity; criminal conduct; identity verification; medical emergencies; and escalation to management, a G6 reporting channel, the National Human Trafficking Hotline, or law enforcement.

148. Upon information and belief, the G6 Defendants conducted or required periodic quality-assurance inspections and audits; reviewed guest complaints and online reviews; monitored compliance with System standards; required corrective action; and retained authority to impose penalties, require additional training, suspend access to System benefits, or terminate a franchise or license for material noncompliance.

149. Upon information and belief, the subject Motel 6 paid G6 recurring royalties, franchise fees, reservation or System fees, marketing contributions, and other charges calculated in whole or in part as a percentage of gross room revenue. G6's financial benefit therefore increased when additional rooms were rented or stays were extended, including rooms and stays through which T harbored and exploited Plaintiff.

150. Upon information and belief, G6 controlled or materially influenced employment-related matters at the subject Motel 6, including job descriptions, hiring criteria, advertising, orientation, training, advancement, discipline, staffing standards, wage or salary guidance, and termination standards; regulated room rates and required discounts; required approved internet, Wi-Fi, cybersecurity, payment, security, and technology vendors; maintained the ability to access, collect, monitor, analyze, or obtain guest internet, browsing, reservation, payment, housekeeping, and occupancy data; and prescribed whether websites associated with commercial-sex advertising could be accessed through hotel internet services.

151. Upon information and belief, the G6 Defendants retained and exercised control over the response to human trafficking and serious criminal activity at Motel 6 properties. That control included determining whether and when trafficking training would be provided; the content and delivery of training; who was required to complete it; the

consequences of noncompliance; the existence and use of reporting channels; escalation criteria; property risk assessments; additional training or resources for high-risk hotels; contact with law enforcement; and investigation or response by safety, security, or critical-incident personnel.

152. The preceding control allegations are pleaded cumulatively and in the alternative. Plaintiff does not depend solely on allegations concerning wages, pricing, Wi-Fi monitoring, or other broad operational control. The core control alleged here relates directly to the injury-producing work: accepting and entering T's reservations; registering T and Plaintiff; collecting and processing payment; assigning and extending rooms; issuing access; recording occupants; applying identity and visitor procedures; responding to repeated housekeeping refusals; receiving and escalating guest-safety information; managing do-not-rent decisions; training front-office and housekeeping personnel; and inspecting compliance with those procedures.

153. At all relevant times, the Motel 6 Operator Defendants and their personnel acted as G6's actual agents with respect to the mandatory System functions over which G6 retained the contractual right of control or exercised actual control. The employees who registered T, processed or extended stays, issued room access, interacted with Plaintiff, responded to housekeeping refusals, controlled visitor access, and received or escalated safety information acted within the scope of those delegated System functions.

154. Upon information and belief, G6 also created apparent authority by requiring the use of Motel 6 marks, signs, uniforms, stationery, websites, central telephone numbers, standardized reservation channels, loyalty and marketing programs, and uniform guest-facing procedures. T selected and repeatedly returned to the branded Motel 6 in reliance

on the continuity, accessibility, anonymity, and authority represented by that System; and Plaintiff's exploitation was prolonged as a result.

155. Upon information and belief, the G6 Defendants and the Motel 6 Operator Defendants were joint or integrated employers, or ratified one another's employment of personnel, with respect to one or more functions relevant to Plaintiff's trafficking, including front-office, reservation, guest-service, housekeeping, security, reporting, and anti-trafficking functions.

156. Upon information and belief, the franchise agreements, operating manuals, safety and security policies, incident-reporting protocols, guest-complaint systems, quality-assurance procedures, insurance-reporting requirements, and other franchise-related documents applicable to the subject Motel 6 required Paramount Hospitality, LP and Esquire Hospitality Management, LLC to report to the G6 Defendants serious criminal incidents, law-enforcement activity, arrests occurring at the property, prostitution-related activity, significant guest-safety complaints, governmental investigations, incidents creating potential liability or reputational harm, and suspected human trafficking. The October 2014 prostitution-related arrests at the property and the January 2015 guest complaint and management response fell within one or more of those reporting categories. Upon information and belief:

a. Paramount Hospitality, LP and Esquire Hospitality Management, LLC reported or transmitted the arrests, the guest complaint, the management response, and the claimed corrective action to one or both G6 Defendants;

b. The information was entered into, transmitted through, or available within G6's centralized guest-relations, incident-reporting, safety, property-management, quality-

assurance, franchise-compliance, insurance-reporting, or review-monitoring systems;

c. The G6 Defendants received, reviewed, or had access to the information through those systems, property inspections, management communications, or mandatory reporting requirements; and

d. Paramount Hospitality, LP and Esquire Hospitality Management, LLC also reported the suspected trafficking of Plaintiff, the suspicious activity associated with T's repeated stays, or substantially similar Plaintiff-specific circumstances to one or both G6 Defendants.

157. Upon information and belief, before Plaintiff's trafficking at Motel 6 Amarillo TX West ended, the Motel 6 Operator Defendants generated, received, transmitted, or escalated incident reports, guest-safety information, law-enforcement information, management communications, quality-assurance findings, insurance notices, hotline reports, or other information identifying T and Plaintiff or describing their repeated stays and suspected trafficking. Upon information and belief, the Motel 6 Operator Defendants reported suspected trafficking of Plaintiff to one or both G6 Defendants, placing G6 on Plaintiff-specific and venture-specific notice.

158. After receiving Plaintiff-specific or venture-specific notice, the G6 Defendants affirmatively continued their participation by, upon information and belief, maintaining T's access to the reservation and property-management systems; processing, transmitting, accepting, or supporting later reservations or payments; permitting later stays or extensions; failing to apply or affirmatively declining to apply a do-not-rent restriction; directing, approving, or ratifying the property's continued response; continuing to supply operational services supporting the stays; and continuing to collect royalties, reservation

fees, System fees, or other value attributable to later room revenue.

159. Those alleged post-notice acts were not merely failures to prevent wrongdoing. They were affirmative commercial and operational acts that continued to provide T with rooms, access, reservation and payment services, management support, and the cover of a legitimate branded hotel after the G6 Defendants knew or should have known that the venture was trafficking Plaintiff.

## CHOICE HOTELS OPERATING, FRANCHISING, AND CONTROL RELATIONSHIP

160. Choice franchised or licensed the Quality Inn brand used at Quality Inn Amarillo East. Hark Hospitality, LLC and 3J Hospitality, LLC (collectively, the "Quality Inn Operator Defendants") owned, leased, operated, managed, staffed, and/or held the Quality Inn license for the property during relevant portions of Plaintiff's trafficking.

161. The precise Choice franchise agreement, Standards manuals, amendments, property-management requirements, training materials, inspection protocols, guest-safety procedures, reservation-system requirements, reporting protocols, and other System documents applicable to Quality Inn Amarillo East from 2013 through 2017 are in Defendants' possession and are not publicly available to Plaintiff. Allegations concerning those materials are therefore pleaded on information and belief.

162. Choice's contemporaneous public materials confirm that the Quality Inn system included an above-property, cloud-based property-management platform known as choiceADVANTAGE. By October 2013 Choice described choiceADVANTAGE as its cloud-based hotel property-management system, with functions for guest servicing, revenue management, remote access, integration with Choice programs, management

reporting, room assignments, real-time room status, and maintenance and inventory flags.

163. Upon information and belief, Quality Inn Amarillo East was required to use choiceADVANTAGE or another Choice-approved property-management system integrated with Choice's central reservation, website, telephone, distribution, rewards, marketing, and payment programs. The system received, generated, transmitted, or made accessible guest names, room assignments, reservation history, payment information, occupancy, room status, stay extensions, repeat stays, housekeeping information, and property-performance data.

164. Choice publicly reported that its franchise fees generally included an initial affiliation fee, a royalty fee, and a marketing and reservation-system fee. As of year-end 2015, Choice reported standard Quality Inn royalty fees of 4.65% of gross room revenue and marketing and reservation-system fees of 3.85%, while noting that agreements were individually negotiated. Upon information and belief, Choice received comparable percentage-based royalties, reservation fees, marketing contributions, or other value from the subject Quality Inn.

165. Choice also publicly reported field-based franchise-service personnel who advised franchised properties regarding quality assurance, marketing, and the reservation system; a proprietary property-management and rate-management platform; centralized reservation and distribution channels; and substantial reservation volume processed through the central system.

166. Choice's public human-rights materials state that, as of 2015, Choice was a member of the PACT Tourism Child-Protection Code of Conduct; provided required online training titled "Combating Human Trafficking in Your Hotel" for management and staff of

franchised hotels; distributed posters, videos, newsletters, convention education, and event alerts; and used field-based associates to visit hotels and encourage completion of the training.

167. Upon information and belief, Choice required the Quality Inn Operator Defendants to operate the subject property as part of Choice's mandatory and integrated Quality Inn System and to comply with Choice standards, specifications, policies, operating methods, training requirements, inspection programs, technology requirements, reservation and payment procedures, guest-service standards, human-rights requirements, and anti-trafficking requirements.

168. Upon information and belief, Choice prescribed, supplied, or approved reservation, property-management, front-office, guest-service, housekeeping, security, and incident-response procedures. Those procedures governed registration; payment; identity verification; room assignment; stay extensions; visitor and occupant information; room status; repeated housekeeping refusals; guest complaints; suspicious reservations or payment patterns; guest welfare; commercial-sex indicators; and escalation to property management, Choice, the National Human Trafficking Hotline, emergency services, or law enforcement.

169. Upon information and belief, Choice supplied or required software, hardware, portals, telephone numbers, websites, customer-support channels, review and response platforms, Choice Privileges, ChoiceU or comparable training portals, and other systems through which suspicious activity, guest-safety information, complaints, reviews, law-enforcement activity, inspection findings, and training compliance could be communicated to or reviewed by Choice.

170. Upon information and belief, Choice conducted or required regular quality-assurance inspections and audits; reviewed guest comments and customer reviews; monitored Quality Inn compliance with System standards; required corrective action; and retained authority to impose fees or penalties, require training or remediation, suspend System access, or terminate the franchise or license for material noncompliance.

171. Upon information and belief, Choice controlled or materially influenced employment-related matters at the subject Quality Inn, including job descriptions, hiring criteria, recruitment or employment advertising, orientation, training, advancement, discipline, staffing standards, wage or salary guidance, and termination standards; fixed, regulated, recommended, or constrained room rates, discounts, and revenue-management decisions; required approved internet, Wi-Fi, cybersecurity, payment, security, and technology vendors; and maintained the ability to access, collect, monitor, analyze, or obtain guest internet, browsing, reservation, payment, housekeeping, and occupancy data.

172. Upon information and belief, Choice made decisions directly affecting the operation and maintenance of the subject Quality Inn, prescribed standardized or strict operating rules, specified aspects of the construction and maintenance of the facility, exercised or retained day-to-day control over one or more operations, and deprived the Quality Inn Operator Defendants of independence in one or more business functions implicated by Plaintiff's trafficking.

173. The preceding control allegations are pleaded cumulatively and in the alternative. Plaintiff does not depend solely on allegations concerning wages, pricing, Wi-Fi monitoring, or broad operational control. The core control alleged here relates directly to the injury-producing work: accepting and entering T's reservations; registering T and

Plaintiff; collecting and processing payment; assigning and extending rooms; issuing access; recording occupants; managing room status and housekeeping; applying identity and visitor procedures; receiving and escalating guest-safety information; training front-office and housekeeping personnel; monitoring completion of anti-trafficking training; and inspecting compliance with those procedures.

174. At all relevant times, the Quality Inn Operator Defendants and their personnel acted as Choice's actual agents with respect to the mandatory System functions over which Choice retained the contractual right of control or exercised actual control. The employees who registered T, processed or extended stays, issued room access, interacted with Plaintiff, observed commercial-sex buyers passing through the lobby, provided guest services, managed room status, and received or escalated safety information acted within the scope of those delegated System functions.

175. Upon information and belief, Choice created apparent authority by requiring the use of Quality Inn and Choice signs, stationery, websites, central telephone numbers, standardized reservation channels, Choice Privileges, uniforms or identification, marketing, and uniform guest-facing procedures. T selected and repeatedly used the branded Quality Inn in reliance on the continuity, accessibility, anonymity, and authority represented by that System; and Plaintiff's exploitation was prolonged as a result.

176. Upon information and belief, Choice and the Quality Inn Operator Defendants were joint or integrated employers, or ratified one another's employment of personnel, with respect to one or more functions relevant to Plaintiff's trafficking, including front-office, reservation, guest-service, housekeeping, security, reporting, human-rights, and anti-trafficking functions.

177. Upon information and belief, the Quality Inn Operator Defendants were required by the franchise agreement, operations manuals, human-rights and anti-trafficking policies, training requirements, incident-reporting protocols, guest-complaint systems, inspection and quality-assurance reports, insurance requirements, and confidential escalation manuals to report suspected trafficking, serious criminal activity, prostitution-related complaints, significant guest-safety concerns, law-enforcement activity, governmental investigations, incidents creating potential liability or reputational harm, and suspected human trafficking. Upon information and belief:

a. Hark Hospitality, LLC and 3J Hospitality, LLC reported or transmitted the 2015 prostitution-related customer complaint, substantially similar complaints, suspicious activity associated with repeated visitor traffic, and the suspected trafficking of Plaintiff to Choice;

b. Choice received, reviewed, monitored, or had access to those reports and complaints through its customer-review and response platforms, guest-relations systems, property-management systems, quality-assurance processes, franchise-compliance systems, inspections, or management communications;

c. Choice's centralized systems contained or made available reservation, occupancy, payment, room-assignment, guest-service, complaint, and property-performance information relevant to the repeated use of the property by T; and

d. Choice continued providing reservation, property-management, marketing, guest-relations, and franchise services to the subject property and continued receiving royalties, system fees, reservation fees, or other revenue after receiving or having access to the information alleged above.

178. Upon information and belief, before Plaintiff's trafficking at Quality Inn Amarillo East ended, the Quality Inn Operator Defendants generated, received, transmitted, or escalated incident reports, guest-safety information, law-enforcement information, management communications, guest complaints, quality-assurance findings, insurance notices, training or compliance communications, or other information identifying T and Plaintiff or describing their repeated stays and suspected trafficking. Upon information and belief, the Quality Inn Operator Defendants reported suspected trafficking of Plaintiff to Choice, placing Choice on Plaintiff-specific and venture-specific notice.

179. After receiving Plaintiff-specific or venture-specific notice, Choice affirmatively continued its participation by, upon information and belief, maintaining T's access to Choice reservation and property-management systems; processing, transmitting, accepting, or supporting later reservations or payments; permitting later stays or extensions; declining to impose or require a restriction; directing, approving, or ratifying the property's continued response; continuing to provide operational, marketing, rewards, guest-service, training, and technology support for the stays; and continuing to collect royalties, reservation-system fees, marketing contributions, or other value attributable to later room revenue.

180. Those alleged post-notice acts were affirmative commercial and operational acts that continued to provide T with rooms, access, reservation and payment services, management support, and the cover of a legitimate branded hotel after Choice knew or should have known that the venture was trafficking Plaintiff.

## HOLIDAY INN OWNERSHIP, OPERATION, MANAGEMENT, AND FRANCHISOR RELATIONSHIP

181. Publicly available business information associates I Ram Money Tree Investments, Ltd. with the Holiday Inn Amarillo West Medical Center beginning in approximately 2011. Public financing and acquisition records identify an October 2014 acquisition of a three-hotel Amarillo portfolio that included the Holiday Inn Amarillo West Medical Center, and identify AHIP TX Amarillo 8231 Properties LLC, AHIP TX Amarillo 8231 Enterprises LLC, and other portfolio entities as borrowers and ONE TX West Medical HI Management LLC as a property manager. AHIP publicly identified ONE Lodging Management, Inc., then known as Tower Rock Hotels & Resorts Inc. ('ONE/Tower Rock'), as its exclusive hotel manager for the acquired portfolio.

182. Upon information and belief, I Ram owned, leased, operated, managed, staffed, and/or held the Holiday Inn license before the October 2014 acquisition. Upon information and belief, after that acquisition AHIP TX Amarillo 8231 Properties LLC held the real property or hotel asset; AHIP TX Amarillo 8231 Enterprises LLC operated the hotel, employed personnel, received hotel revenue, and/or held the Holiday Inn license; ONE TX West Medical HI Management LLC directly managed the property; and ONE/Tower Rock exercised portfolio-level, supervisory, and/or direct management authority.

183. Upon information and belief, the Holiday Inn Local Defendants knowingly received different forms of financial value from the hotel-operating and room-rental transactions. I Ram and AHIP TX Amarillo 8231 Enterprises LLC received room revenue, occupancy revenue, guest-service revenue, and other hotel-operating proceeds. AHIP TX Amarillo 8231 Properties LLC received rent, lease payments, distributions, increased asset

value, debt-service benefits, or other value generated by operation of the hotel. ONE West Medical and ONE/Tower Rock received management fees, reimbursements, incentive compensation, revenue-based compensation, or other value arising from management and operation of the property. Each entity's financial benefit increased or was supported when rooms were rented or stays were extended, including the rooms and stays through which T harbored and exploited Plaintiff.

184. ONE Holdings is not alleged to have received any contemporaneous benefit from Plaintiff's 2013–2017 trafficking. Any claim against ONE Holdings concerning those financial benefits is solely derivative of its alleged assumption of or succession to ONE/Tower Rock's liabilities.

185. The precise ownership, lease, management, employment, and Holiday Inn license agreements applicable to the property from 2013 through 2017 are in Defendants' possession. Plaintiff therefore pleads the roles of the Holiday Inn owner/operator defendants in the alternative.

186. The precise Holiday license agreements, Standards manuals, amendments, property-improvement requirements, training materials, inspection protocols, reservation-system requirements, guest-feedback procedures, reporting protocols, and other System documents applicable to the property during 2013 through 2017 are likewise in Defendants' possession and are pleaded on information and belief.

187. Upon information and belief, Holiday required its licensees and managers to operate the property as part of a mandatory and integrated Holiday Inn System, including reservation processing; a property-management system; front-office and registration procedures; room assignment, access, key issuance, and stay extensions; guest-service

standards; management and guest-service training; guest complaints and consumer-opinion information; quality-assurance inspections; safety and incident reporting; corrective action; and recurring royalty, reservation, marketing, and System fees calculated in whole or in part from gross room revenue.

188. Upon information and belief, Holiday received, collected, maintained, or had access to information concerning reservations, occupancy, room availability, repeat stays, guest feedback, property performance, training compliance, and inspection results. Holiday established or approved training and certification requirements for hotel management, front-office, and guest-service functions and retained authority to inspect the property, demand corrective action, condition continued use of the brand, suspend System benefits, or terminate the license.

189. Upon information and belief, Holiday also controlled or materially influenced employment-related matters; job descriptions; hiring, orientation, training, advancement, discipline, staffing, wage or salary guidance, and termination standards; room rates, discounts, and revenue-management decisions; approved internet, Wi-Fi, cybersecurity, payment, security, and technology vendors; access to guest internet, browsing, reservation, payment, housekeeping, and occupancy data; and other day-to-day business functions implicated by Plaintiff's trafficking.

190. The core control alleged against Holiday relates directly to the injury-producing work: accepting and entering T's reservations; registering T while Plaintiff stood silently beside him; collecting and processing payment; assigning and extending rooms; issuing room access; applying identity and occupant procedures; managing visitor access; receiving guest-safety information; training front-office and guest-service personnel;

inspecting front-office, guest-service, safety, and guest-comment functions; and escalating suspected trafficking or serious criminal activity.

191. At all relevant times, the Holiday Inn licensees, owners, operators, managers, and their personnel acted as Holiday's actual agents with respect to the mandatory System functions over which Holiday retained the contractual right of control or exercised actual control. Upon information and belief, Holiday also created apparent authority through the Holiday Inn name, signs, websites, central-reservation channels, marketing, loyalty programs, standardized front-office procedures, and guest-facing representations.

192. Upon information and belief, ONE West Medical acted as the property-level manager and actual agent, submanager, or management affiliate of ONE/Tower Rock and one or both AHIP 8231 entities. ONE/Tower Rock acted as the master hotel manager and actual agent of one or both AHIP 8231 entities with respect to management, staffing, training, front-office operations, guest services, housekeeping, security, incident response, reporting, and compliance at the subject Holiday Inn.

193. Upon information and belief, the on-site general manager, front-desk personnel, housekeeping personnel, security personnel, and other hotel employees acted within the course and scope of their employment or agency for I Ram during the pre-acquisition period and for AHIP TX Amarillo 8231 Enterprises LLC, ONE West Medical, and/or ONE/Tower Rock during the post-acquisition period. To the extent AHIP TX Amarillo 8231 Properties LLC retained control over the premises, management agreement, safety requirements, or the conduct at issue, those managers and management entities also acted within the scope of authority delegated by or exercised for AHIP TX Amarillo 8231 Properties LLC.

194. Each Holiday Inn Local Defendant ratified the conduct of the persons and entities acting for it by retaining the benefits of the room transactions, continuing the applicable management and operating relationships after receiving notice of the material circumstances, failing to disavow the conduct, and continuing to authorize or support later room rentals and hotel services.

195. Upon information and belief, the Holiday Inn owner/operator defendants were required to report suspected trafficking, serious criminal activity, law-enforcement contacts, guest-safety incidents, complaints, inspection findings, and other reportable events to Holiday. Before Plaintiff's trafficking at the property ended, they generated, received, transmitted, or escalated information identifying T and Plaintiff or describing their repeated stays, buyer traffic, cash payments to T, Plaintiff's visible youth, and suspected trafficking; and they reported or otherwise transmitted Plaintiff-specific or venture-specific information to Holiday.

196. After receiving Plaintiff-specific or venture-specific notice, Holiday affirmatively continued its participation by, upon information and belief, maintaining T's access to reservation and property-management systems; processing, transmitting, accepting, or supporting later reservations or payments; permitting later stays or extensions; directing, approving, or ratifying the property's continued response; continuing to provide operational and technology support for the stays; and continuing to collect royalties, reservation fees, System fees, or other value attributable to later room revenue.

197. The precise contractual allocations, reports, recipients, dates, System records, and post-notice transactions alleged in the G6, Choice, and Holiday sections are within Defendants' possession and will be particularized through discovery. Plaintiff has alleged

the factual basis for her information-and-belief allegations: the repeated property-specific conduct observed by hotel personnel; the mandatory systems and reporting channels described above; the publicly documented System functions; the franchisors' percentage-based financial interests; and the franchisees' contractual dependence on those systems.

**SUCCESSOR AND ASSIGNEE LIABILITY**

**OF ONE LODGING HOLDINGS LLC**

198. ONE Holdings did not become involved in the AHIP hotel-management relationship until approximately April 2018, after the conduct giving rise to Plaintiff's claims. Plaintiff does not allege that ONE Holdings directly owned, operated, managed, possessed, franchised, staffed, or controlled the subject Holiday Inn during Plaintiff's trafficking, or that ONE Holdings possessed contemporaneous knowledge of Plaintiff or T during that period.

199. ONE Holdings is sued solely in the alternative and to the extent that it expressly assumed liabilities arising from ONE/Tower Rock's pre-transfer management operations, became a legal successor responsible for those liabilities, or otherwise became derivatively responsible under the governing transaction, assignment, assumption, merger, management, or corporate documents.

200. Liability asserted against ONE Holdings under each substantive count is derivative of and no broader than the liability of ONE/Tower Rock, except to the extent discovery establishes a separate legally sufficient basis for liability. Unless expressly stated otherwise, allegations below that a Defendant contemporaneously knew of Plaintiff's trafficking, received value during the trafficking period, participated in room transactions,

controlled the premises, employed hotel personnel, or committed an affirmative act during 2013–2017 do not refer to ONE Holdings.

201. The agreements and records necessary to determine whether ONE Holdings expressly assumed or succeeded to the liabilities at issue—including transaction documents, assignment and assumption agreements, schedules of assumed and excluded liabilities, corporate records, and amendments to the Master Hotel Management Agreement—are exclusively or primarily within the possession of ONE Holdings, ONE/Tower Rock, Aimbridge-affiliated entities, and AHIP-related entities.

## FIRST CAUSE OF ACTION: TVPRA

**Trafficking Victims Protection Reauthorization Act ("TVPRA")**

**18 U.S.C. § 1595**

**(Against All Direct-Liability Defendants; Against ONE Lodging Holdings LLC Solely as Alleged Assignee and Successor to ONE/Tower Rock)**

202. Plaintiff incorporates the preceding allegations.

203. T and his associates engaged in a venture that violated 18 U.S.C. § 1591 by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, and maintaining Plaintiff for commercial sex while she was under eighteen and through force, threats of force, fraud, coercion, physical violence, drug-facilitated control, isolation, and threats.

204. The relevant venture is pleaded in the alternative as: (a) T's specific trafficking venture, which depended on repeated room rentals, access, services, anonymity, noninterference, and operational support from the hotels; and (b) each hotel-operating venture through which the local and franchisor defendants jointly offered, reserved, processed, supplied, extended, managed, and profited from rooms while knowingly or

constructively permitting T's trafficking venture to use those hotel operations.

205. Each property owner, operator, manager, licensee, and employer defendant knowingly received room revenue and other value from its participation in the specific transactions and continuing commercial relationship through which T obtained rooms to harbor and exploit Plaintiff.

206. The local hotel defendants participated through affirmative acts that went beyond a single ordinary room rental, including repeated or extended rentals; registration and payment transactions; room assignments; key issuance; guest services; housekeeping decisions; visitor access; repeated acceptance of T and Plaintiff; and continued provision of rooms and services after personnel observed the Plaintiff-specific indicators alleged for each property.

207. The local hotel defendants knew or should have known that the venture was engaged in a § 1591 violation because their managers and personnel repeatedly observed facts indicating not only commercial sex but Plaintiff's minority or apparent minority, T's coercive control, drug impairment, restricted behavior, repeated buyer traffic, cash payments to T, unusual stays, violence, and the other property-specific circumstances alleged above.

208. With respect to the Holiday Inn Amarillo West Medical Center, Plaintiff alleges I Ram's participation, knowledge, financial benefit, and responsibility for stays occurring during its pre-acquisition ownership, operation, management, employment, or licensing period. Plaintiff alleges the participation, knowledge, financial benefit, and responsibility of AHIP TX Amarillo 8231 Properties LLC, AHIP TX Amarillo 8231 Enterprises LLC, ONE West Medical, and ONE/Tower Rock for stays occurring during their respective post-

acquisition ownership, possession, operation, management, employment, or licensing periods. Because the precise stay dates and contractual allocation of responsibilities are reflected in Defendants' records, Plaintiff pleads these theories in the alternative. ONE Holdings is sued solely in the successor capacity alleged above.

209. Each franchisor defendant knowingly received royalties, reservation fees, marketing contributions, System fees, payment-related benefits, data, or other things of value from its participation in the hotel-operating and room-rental transactions through which Plaintiff was trafficked.

210. The franchisor defendants participated through the affirmative System acts alleged above, including receiving and transmitting reservations; providing and maintaining property-management, payment, rate, inventory, guest-service, training, inspection, reporting, review, safety, and franchise-compliance systems; making or supporting repeated transactions; receiving property and guest information; and continuing those services and benefits after receiving Plaintiff-specific, venture-specific, or property-specific information.

211. Upon information and belief, each franchisor knew or should have known that the venture was trafficking Plaintiff based on the mandatory reports and escalation channels; Plaintiff-specific or venture-specific reports; reservation, payment, occupancy, guest, housekeeping, complaint, inspection, training, incident, and law-enforcement information available through its Systems; the repeated transactions involving T and Plaintiff; property-specific prostitution and criminal-activity information; and the visible indicators observed by personnel acting within the franchisor-controlled System functions.

212. In the alternative, the local hotel defendants acted as the actual agents of the

respective franchisors in performing the mandatory reservation, registration, payment, room-assignment, access, guest-service, housekeeping, safety, reporting, training, and inspection functions alleged above. Their TVPRA violations committed within the scope of that authority are imputed to the respective franchisors.

213. Defendants' knowing benefits, participation, and conduct caused, facilitated, and prolonged Plaintiff's trafficking and injuries. Plaintiff seeks compensatory damages, punitive damages as permitted by law, reasonable attorney's fees, costs, and all other relief available under § 1595.

**SECOND CAUSE OF ACTION: CAVRA**
**Child Abuse Victims Rights Act ("CAVRA")**
**18 U.S.C. § 2255**
**(Against All Direct-Liability Defendants; Against ONE Lodging Holdings LLC Solely as Alleged Assignee and Successor to ONE/Tower Rock)**

214. Plaintiff incorporates the preceding allegations.

215. While Plaintiff was a minor, T and his associates violated 18 U.S.C. § 1591(a)(1) by knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, and maintaining Plaintiff, knowing or in reckless disregard of the fact that she had not attained eighteen years of age and would be caused to engage in commercial sex, and knowing that force, threats of force, fraud, or coercion would be used.

216. The local hotel defendants violated § 1591(a)(1) and/or § 1591(a)(2) by knowingly harboring, providing, maintaining, assisting, supporting, or facilitating the harboring and maintenance of Plaintiff at the hotels, and by knowingly benefiting from participation in T's venture, while knowing or acting in reckless disregard of Plaintiff's minority and/or the force, threats, fraud, and coercion used against her.

217. The local hotel defendants' actual knowledge or reckless disregard is plausibly inferred from the repeated Plaintiff-specific facts alleged at each property, including her visible youth; T's control; her silence, isolation, drug impairment, restricted behavior, lack of ordinary luggage, repeated presence, pregnancies, visible distress, buyer traffic, cash payments to T, and the repeated nature of the room rentals and services.

218. Upon information and belief, the franchisor defendants violated § 1591(a)(2) by knowingly assisting, supporting, or facilitating the underlying violations through the affirmative System acts alleged above and knowingly receiving value after acquiring actual knowledge or acting in reckless disregard of Plaintiff's minority, T's coercive methods, and the commercial-sex purpose of the repeated stays through Plaintiff-specific or venture-specific reports and information.

219. In the alternative, the § 1591 violations of the local hotel defendants are imputed to the respective franchisors because the local defendants and their personnel acted as actual agents within the scope of the mandatory System functions controlled by the franchisors.

220. Plaintiff suffered personal injury as a result of those violations and seeks actual damages or statutory liquidated damages, costs, reasonable attorney's fees, punitive damages, and appropriate equitable relief under § 2255.

## THIRD CAUSE OF ACTION

**Liability for Trafficking of Persons**

**Texas Civil Practice and Remedies Code Chapter 98**

**(Against All Direct-Liability Defendants; Against ONE Lodging Holdings LLC Solely as Alleged Assignee and Successor to ONE/Tower Rock)**

221. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

222. This count is based on trafficking and Defendant conduct occurring in Texas while Plaintiff was younger than eighteen, before she reached eighteen in August 2016. Later events are incorporated as evidence of continuity, causation, knowledge, and damages, but are not relied upon as a separate untimely state-law accrual event except to the extent permitted by law.

223. Texas Civil Practice and Remedies Code § 98.002(a) imposes liability on a defendant who engages in trafficking of persons or intentionally or knowingly benefits from participating in a venture that traffics another person. “Trafficking of persons” includes conduct constituting an offense under Texas Penal Code Chapter 20A.

224. During the child-trafficking period, T knowingly transported, enticed, recruited, harbored, provided, maintained, and obtained Plaintiff; isolated her from family; controlled her communications and movement; supplied drugs; threatened and assaulted her; caused her, as a child, to engage in prostitution; arranged the commercial-sex encounters; advertised her; and retained the proceeds. His conduct constituted trafficking of a child and compelling prostitution, including conduct prohibited by the applicable versions of Texas Penal Code §§ 20A.02 and 43.05.

225. T’s repeated harboring and exploitation of Plaintiff through the subject hotels constituted a specific trafficking venture. The venture depended on recurring access to rooms in which Plaintiff could be harbored, advertised, presented to commercial-sex buyers, and moved from property to property while reducing the risk of detection or intervention.

226. The local hotel defendants intentionally or knowingly received room charges, extended-stay revenue, fees, ancillary revenue, occupancy revenue, and other value from

their participation in that venture.

227. The local hotel defendants' knowledge was not limited to general awareness of prostitution. Through their managers and employees acting within the course and scope of assigned hotel functions, they repeatedly observed Plaintiff-specific circumstances demonstrating that T was controlling and commercially exploiting a minor or visibly underage girl.

228. After acquiring actual knowledge of Plaintiff's trafficking, the local hotel defendants affirmatively continued to participate by renting or extending rooms, issuing or renewing keys, accepting and processing payments, allowing T and Plaintiff to remain at or return to the properties, providing hotel services and supplies, permitting repeated buyer access, and continuing to make rooms available rather than refusing additional transactions or applying available restrictions.

229. Those acts were overt acts beyond mere negative acquiescence. They affirmatively supplied the premises, room-rental transactions, access, keys, services, anonymity, and commercial cover that aided the success of T's venture.

230. Upon information and belief, each franchisor received Plaintiff-specific or venture-specific information before the child-trafficking period at its branded property ended and thereafter affirmatively continued to provide or maintain reservations, property-management access, payment or transaction support, training and operational services, System access, and franchise support for later stays while receiving royalties, reservation fees, marketing contributions, System fees, or other value.

231. The franchisors' alleged post-notice System transactions and services were overt acts designed to aid or that did aid the continued success of the hotel-operating and

trafficking venture. Plaintiff does not rely solely on passive inaction, generalized brand awareness, or a failure to prevent the misconduct of others.

232. In the alternative, the local hotel defendants engaged in conduct described by Texas Penal Code § 20A.02 by knowingly benefiting from participation in a venture involving the trafficking of a child and compelling prostitution. Their conduct and knowledge are imputed to the respective owners, employers, licensees, and actual principals.

233. Defendants' conduct enabled T to harbor and repeatedly exploit Plaintiff, reduced the likelihood of detection or intervention, prolonged the exploitation, and caused Plaintiff's physical, psychological, reproductive, emotional, and economic injuries.

234. This claim is timely under Texas Civil Practice and Remedies Code §§ 16.001 and 16.0045(a). Plaintiff was under the legal disability of minority throughout the conduct supporting this count, and the action was filed well within the applicable period.

235. Plaintiff seeks all relief authorized by Chapter 98, including actual damages, mental-anguish damages, court costs, reasonable attorney's fees, exemplary damages as permitted by law, and applicable joint and several liability. Plaintiff pleads this count cumulatively and in the alternative but does not seek a duplicative recovery.

## FOURTH CAUSE OF ACTION

### Negligence

### (Against the Property Owner/Operator Defendants and, as Limited Below, the Franchisor Defendants)

236. Plaintiff incorporates the preceding allegations.

237. The property owner, operator, manager, licensee, and employer defendants owed Plaintiff duties arising from their ownership, possession, operation, management, control

of hotel activities, provision of lodging, innkeeper–guest or occupier relationship, and control of check-in, registration, room assignment, access, housekeeping, security, guest services, incident response, and emergency response.

238. Those defendants breached their duties by continuing repeated rentals after observing trafficking indicators; failing to respond reasonably to visible youth, danger, incapacity, and coercive control; allowing uncontrolled buyer access; failing to follow applicable identity, occupant, visitor, housekeeping, guest-welfare, incident, and emergency procedures; failing to summon assistance when warranted; and failing to use reasonable care in the controlled operations identified above.

239. With respect to the Holiday Inn Amarillo West Medical Center, I Ram and AHIP TX Amarillo 8231 Properties LLC and/or AHIP TX Amarillo 8231 Enterprises LLC owed duties arising from their respective ownership, possession, operation, licensing, employment, and control of the property and hotel operations. ONE West Medical and ONE/Tower Rock voluntarily undertook and exercised control over hotel management, staffing, training, supervision, front-office operations, guest services, housekeeping, security, incident response, safety, reporting, and compliance functions and therefore were required to perform those undertaken functions with reasonable care.

240. Upon information and belief, the Holiday Inn Local Defendants breached those duties by failing reasonably to hire, train, supervise, monitor, discipline, and retain front-desk, guest-service, housekeeping, security, and management personnel; failing to communicate and enforce guest-safety and trafficking-response procedures; failing to investigate or escalate the repeated indicators alleged; and continuing to provide rooms, access, services, and operational support to T.

241. ONE Holdings is not alleged to have owed or breached a contemporaneous negligence duty during Plaintiff's trafficking and is included in this count solely to the extent it assumed or succeeded to ONE/Tower Rock's liability.

242. The franchisor defendants are included in this negligence count only as to specific injury-producing operations over which they actually exercised control or retained a contractual right of control, or that they voluntarily undertook, including the reservation, registration, payment, room-access, identity, guest-service, housekeeping, safety, training, inspection, reporting, and escalation functions alleged above.

243. Upon information and belief, the franchisors' control extended to the broader employment, wage, rate, internet, technology, and day-to-day operational matters alleged above. Plaintiff pleads those facts as additional evidence of control, while the duty alleged is anchored in the particular activities that caused or prolonged the injury.

244. Defendants' breaches proximately caused or prolonged Plaintiff's trafficking while she was a minor and caused the injuries alleged. This count is timely under Texas Civil Practice and Remedies Code §§ 16.001 and 16.0045(a).

## FIFTH CAUSE OF ACTION

**Premises Liability and Negligent Security**

**(Against the Defendants that Owned, Occupied, Possessed, or Controlled the Subject Properties During the Relevant Period; Against ONE Lodging Holdings LLC Solely as Alleged Assignee and Successor)**

245. Plaintiff incorporates the preceding allegations and pleads this count in the alternative to her negligent-activity theories.

246. The owner/operator defendants possessed or controlled the subject properties.

Upon information and belief, one or more franchisor defendants also retained or exercised sufficient control over portions of the premises, access, front-office, security, housekeeping, guest-service, and inspection functions to owe duties concerning those controlled areas or activities.

247. With respect to the Holiday Inn Amarillo West Medical Center, Plaintiff alleges that I Ram owned, occupied, possessed, operated, or controlled the premises during the pre-acquisition period. During the post-acquisition period, Plaintiff alleges that AHIP TX Amarillo 8231 Properties LLC owned or possessed the premises; AHIP TX Amarillo 8231 Enterprises LLC occupied, operated, leased, or controlled the hotel business; and ONE West Medical and ONE/Tower Rock controlled those portions of the premises and operational activities delegated to them under the applicable management agreements. These respective roles are pleaded in the alternative.

248. ONE Holdings did not possess or control the subject premises during Plaintiff's trafficking and is not alleged to be directly liable as a premises possessor. It is included only in its alleged derivative successor capacity.

249. The owner/operator defendants possessed and controlled the subject properties. The recurring use of hotel rooms for commercial sexual exploitation and the risk of violent trafficking were foreseeable based on the totality of the property-specific circumstances alleged above, including:

a. At Motel 6 Amarillo TX West, the October 2014 prostitution-related arrests at the property, the January 2015 guest complaint describing prostitution, drugs, police activity, and unusual room activity, the property manager's response and representation that corrective action had been taken, the later corroborating reviews, the open drug

and commercial-sex activity observed by Plaintiff, the law-enforcement response observed by Plaintiff, and the repeated Plaintiff-specific trafficking indicators observed by personnel;

b. At Quality Inn Amarillo East, the 2015 prostitution-related customer concern, the reported absence of effective front-desk monitoring, Plaintiff's visibly youthful appearance, the repeated passage of Plaintiff and T through the lobby, approximately six to seven commercial-sex buyers per day, the passage of those buyers through common areas, and the repeated observations made by hotel personnel; and

c. At Holiday Inn Amarillo West Medical Center, Plaintiff's repeated presence beside T during registration, her visible youth and silence, the failure to request her identification, repeated commercial-sex buyer traffic through the property, cash payments to T following commercial-sex encounters, and the repeated opportunities of hotel management and personnel to observe Plaintiff and T.

250. Those prior, contemporaneous, and recurring circumstances made the risk of commercial sexual exploitation and violent trafficking sufficiently foreseeable to require reasonable measures concerning room rentals, registration and identification, guest and visitor access, security, incident investigation, reporting, employee response, and intervention.

251. Defendants failed to use reasonable care to reduce the foreseeable risk through reasonable access control, security, inspection, incident investigation, room-rental restrictions, identity and occupant procedures, guest and visitor procedures, housekeeping, do-not-rent measures, staff response, escalation, and response to known dangerous activity.

252. The dangerous conditions and inadequate security were a proximate cause of the

continuation and concealment of Plaintiff's child-period exploitation and injuries. This count is timely under §§ 16.001 and 16.0045(a).

**AGENCY, RATIFICATION, AND VICARIOUS LIABILITY**

253. Plaintiff pleads agency and vicarious liability as theories of liability applicable to each substantive count, not as a substitute for pleading an underlying violation.

254. Each property owner, operator, manager, licensee, and employer defendant is vicariously liable for wrongful acts and omissions of its employees and actual agents committed within the course and scope of assigned hotel functions, including reservation, registration, payment, room assignment, access, housekeeping, security, guest service, incident response, reporting, training, inspection, and management.

255. At the Holiday Inn Amarillo West Medical Center, the acts and knowledge of on-site hotel managers and personnel are attributable to I Ram during the period in which those persons acted within the course and scope of duties performed for I Ram. During the post-acquisition period, the acts and knowledge of on-site personnel are attributable, as applicable and as pleaded in the alternative, to AHIP TX Amarillo 8231 Enterprises LLC, ONE West Medical, and ONE/Tower Rock.

256. ONE West Medical is vicariously liable for acts and omissions of hotel personnel whom it employed, supervised, controlled, or managed. ONE/Tower Rock is vicariously liable for acts and omissions of ONE West Medical and hotel personnel acting within the scope of management authority delegated under the Master Hotel Management Agreement and related property-level agreements. The AHIP 8231 entities are vicariously liable to the extent those management entities and hotel personnel acted as their actual agents within

the scope of delegated authority.

257. Each franchisor is vicariously liable, to the extent established by the governing agreements and actual practice, for wrongful acts and omissions committed by the corresponding local defendants and personnel within the scope of mandatory System functions over which the franchisor retained the right to control the specific details of the injury-producing work or actually exercised such control.

258. Upon information and belief, each franchisor ratified the conduct after receiving actual knowledge of material facts through reports, complaints, inspections, reservations, property-management data, incident communications, law-enforcement information, or other System channels and thereafter accepting the benefits of later transactions, continuing System access and support, declining corrective action, or otherwise affirming the conduct.

259. Plaintiff also pleads apparent agency, joint employment, integrated enterprise, and horizontal or vertical joint-employer theories in the alternative, based on the information-and-belief allegations concerning marks, reservation channels, websites, loyalty programs, uniform guest-facing operations, employment control, shared policies, interrelated operations, and the reasonable belief that the local properties and personnel acted with authority from the respective hotel brands.

260. ONE Holdings is not alleged to have been an actual or apparent principal, employer, joint employer, or ratifying party during Plaintiff's trafficking. Its potential liability under the foregoing agency and vicarious-liability allegations is solely derivative of any liability that it expressly assumed or to which it legally succeeded from ONE/Tower Rock.

## DISCOVERY RULE

261. Plaintiff does not rely on the following alternative tolling allegations to establish the facial timeliness of her TVPRA claim under § 1595(c)(2). They are pleaded solely in the alternative and only to the extent a Defendant asserts that a claim, Defendant-specific theory, or portion of Plaintiff's damages is governed by a different accrual date or limitations period. To the extent defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time she was harmed and through at least 2018, Plaintiff was under coercion and control of traffickers who abused and manipulated her. Thus, Plaintiff did not discover and could not have reasonably discovered the legal cause of her injuries more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Plaintiff– through no fault of her own – lacked the information to bring claims because she did not know both her injuries and the cause of her injuries. This lack of information was due to no fault on the part of Plaintiff but rather was a direct result of Plaintiff being kept under the control of her trafficker, which Defendants facilitated.

262. At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as the term is defined by law, that her injuries arose from being trafficked at Defendant's hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in position to discover the legal cause of her injuries, more than ten years before suit was filed.

263. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the Doctrine of Equitable Tolling because, as a result of being a victim of trafficking, Plaintiff faced extraordinary circumstances, which arose through no fault of

her own, that prevented her from pursing her legal remedies including but not limited to the filing of a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit. Plaintiff's claims are timely and do not result in prejudice to Defendants.

264. As a result of her continuous trafficking at the subject hotels through at least 2018, Plaintiff was beaten, drugged, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

265. Plaintiff was under the continuous control of her traffickers through at least 2018. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights. This continuous trafficking resulted from Defendants continuous facilitating of trafficking at the subject hotel locations named herein and Defendants ongoing venture with one another and with criminal traffickers.

266. To the extent that Defendants assert an affirmative defense of limitations, Plaintiff also invokes the Continuing Tort Doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct. Plaintiff was subject to continuous trafficking at the subject hotel locations through at least 2018 which is not more than 10 years before Plaintiff filed this lawsuit.

267. This continuous trafficking resulted from Defendants continuous facilitation of trafficking at the subject hotel locations named herein and Defendants ongoing venture with one another and with criminal traffickers.

## PRAYER FOR RELIEF

268. Plaintiff requests judgment against each Defendant on the claims and liability theories applicable to that Defendant; actual, compensatory, mental-anguish, statutory, liquidated, and punitive or exemplary damages as authorized by law; joint and several liability where authorized; reasonable attorney's fees and court costs under 18 U.S.C. §§ 1595 and 2255 and Texas Civil Practice and Remedies Code Chapter 98; prejudgment and post-judgment interest; appropriate declaratory or equitable relief; and all other relief to which Plaintiff is entitled. Plaintiff does not seek duplicative recovery for the same injury. As to ONE Lodging Holdings LLC, Plaintiff seeks judgment only to the extent that ONE Holdings expressly assumed, succeeded to, or is otherwise legally responsible for liabilities of ONE/Tower Rock arising from the pre-transfer management operations alleged herein; Plaintiff does not seek to impose direct liability on ONE Holdings based merely on its post-2018 acquisition or operation of management contracts.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

Dated: August 6, 2026

By: /s/ Russ Handy . .

Russ Handy, Esq. (24117976)
**POTTER HANDY, LLP**
1410 E Winding Way, Ste. B
Friendswood, TX 77546
Tel: (415) 534-1911
Fax: (888) 422-5191
E: ServeHT@potterhandy.com
Attorneys for Plaintiff